UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MIRAGE ENTERTAINMENT, INC., a New York corporation, doing business in California as N.Y. MIRAGE ENTERTAINMENT, INC.,

Plaintiff,

v.

FEG ENTRETENIMIENTOS S.A., public limited company; FEG S.A., public limited company; and DOES 1 through 10, inclusive,

Defendants.

FEG ENTRETENIMIENTOS S.A., a public limited company; FEG S.A., a public limited company, and Does 1 through 10, inclusive

Counterclaimants,

v.

MIRAGE ENTERTAINMENT INC., a New York corporation; MARIAH CAREY, an individual; and DOES 1 through 10, inclusive,

Counter-Defendants.

Case No. 1:18-cv-00581-WHP

**Hon. William H. Pauley, III**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF COUNTERCLAIMANTS' OPPOSITION TO COUNTER-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIMS**

MCKOOL SMITH, P.C.
One Bryant Park, 47th Floor
New York, NY 10036
(212) 402-9400
*Attorneys for Counterclaimants*
*FEG ENTRETENIMIENTOS S.A. and FEG S.A.*

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 1

A. Fenix and UTA's Pre-Existing Relationship .......... 1

B. The Tour Agreements .......... 2

C. Fenix's Payments to UTA .......... 3

D. Counter-Defendants Fail to Give Fenix Notice of Cancellation .......... 4

E. Carey Wrongfully and Without Notice Fails to Perform .......... 5

F. Carey Defames Fenix by Falsely Blaming It for the Wrongful Cancellation Via Twitter and Media Blasts .......... 6

III. ARGUMENT .......... 7

A. Counter-Defendants' Motion to Dismiss Inappropriately Relies Upon Extraneous Documents and Raises Factual Disputes .......... 7

1. The Counter-Complaint Does Not Rely On Counter-Defendants' Emails .......... 8

2. General Reference to Correspondence or Knowledge of its Existence is Insufficient to Incorporate Documents into the Counter-Complaint .......... 9

B. Fenix's Breach of Contract Counterclaims Are Plausible .......... 11

1. Counter-Defendants Failed to Provide Notice of Fenix's Alleged Failure to Perform .......... 12

2. Carey Need Not Be Party to the Tour Agreements to be Held Liable for the Breach .......... 13

C. Fenix Alleged Plausible Defamation Counterclaims .......... 15

1. Fenix Alleged Counter-Defendants Published False Statements About Fenix .......... 15

2. Fenix Alleged Fault of Counter-Defendants and Damages .......... 16

3. Mirage and Carey Are Alleged Alter-Egos and Cannot Escape Liability for Acts of the Other ............ 17

4. Fenix Seeks to Hold Counter-Defendants' Liable for Their Statements, Not Those of Third Parties ............ 18

5. Carey's Statements Are Actionable Defamation, Not Pure Opinion........ 18

6. The Communications Decency Act Safe-Harbor is Inapplicable ............ 21

7. Fenix's Defamation Claim is Timely ............ 22

# TABLE OF AUTHORITIES

Page(s)

CASES

*118 East 60th Owners, Inc. v. Bonner Properties*,
677 F.2d 200 (2d Cir. 1982)....22

*Accordia Ne., Inc. v. Thesseus Int'l Asset Fund, N.V.*,
205 F. Supp. 2d 176 (S.D.N.Y. 2002)....13, 14

*Albert v. Loksen*,
239 F.3d 256 (2d Cir. 2001)....17

*Amendola v. Kendzia*,
17 A.D.3d 1105 (4th Dep't 2005)....22

*Anyanwu v. Columbia Broad. Sys., Inc.*
887 F. Supp. 690, 692-93 (S.D.N.Y. 1995)....16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....7

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....7

*Canzona v. Atanasio*,
118 A.D.3d 837 (2d Dep't 2014)....11

*Celle v. Filipino Reporter Enters.*,
209 F.3d 163 (2000)....17, 19

*Cohen Lans LLP v. Naseman*,
No. 14CV4045, 2017 WL 477775 (S.D.N.Y. Feb. 3, 2017)....23

*Corning Inc. v. Freight Revenue Recover of Miami, Inc.*,
No. 11-CV-6377, 2012 WL 1805500 (W.D.N.Y. May 17, 2012)....23

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991)....9, 10

*Davis v. Boeheim*,
24 N.Y.3d 262 (2014)....15, 19, 20, 21

*Davis v. Ross*,
754 F.2d 80 (2d Cir. 1985)....19, 20

*DiFolco v. MSNBC L.L.C.*
622 F.3d 104, 106, 112-13 (2d Cir. 2010) ....................10

*Distribuidora De Discos Karen C. Por A. v. Universal Music Grp.*,
No. 13CV7706, 2017 WL 1019697 (S.D.N.Y. Mar. 15, 2017) ....................23, 24

*Donald Dean & Sons, Inc. v. Xonitek Sys. Corp.*,
656 F. Supp. 2d 314 (N.D.N.Y. 2009) ....................13, 14

*Estate of Mantle v. Rothgeb*,
537 F. Supp. 2d 533 (S.D.N.Y. 2008) ....................23

*First Fidelity Bank N.A. New Jersey v. Companhia de Navegacao Maritima Netumar*,
637 F. Supp. 1182 (S.D.N.Y. 1986) ....................23

*Fishbein v. Miranda*,
670 F. Supp. 2d 264 (S.D.N.Y. 2009) ....................14

*FTC v. LeadClick Media, LLC*,
838 F.3d 158 (2d Cir. 2016) ....................21

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016) ....................7, 10

*Haefner v. New York Media*,
LLC, 82 A.D.3d 481 (1st Dep't 2011) ....................21

*In re Philadelphia Newspapers, LLC*,
690 F.3d 161 (3d Cir. 2012) ....................18

*Jovani Fashion, Ltd. v. Cinderella Divine, Inc*
808 F. Supp. 2d 542, 544, 549 (S.D.N.Y. 2011) ....................10

*LaBounty v. Adler*,
933 F.2d 121 (2d Cir. 1991) ....................7, 21

*Levy v. Smith*,
132 A.D.3d 961 (2d Dep't 2015) ....................15, 18

*Live Face on Web, LLC, v. Five Boro Mold Specialist Inc.*,
No. 15 CV 4779-LTS-SN, 2016 WL 1717218 (S.D.N.Y. Apr. 28, 2016) ....................20, 21

*Mann v. Abel*,
10 N.Y.3d 271 (2008) ....................21

*Matter of Konig v. CSC Holdings, LLC*,
112 A.D.3d 934 (2d Dep't 2013) ....................15

*Ricci v. Teamsters Union Local 456*,
781 F.3d 25 (2d Cir. 2015)....................21

*RJE Corp. v. Northville Indus. Corp.*,
329 F.3d 310 (2d Cir. 2003)....................12

*Rus, Inc. v. Bay Indus., Inc.*,
322 F. Supp. 2d 302 (S.D.N.Y. 2003)....................14

*Sallustio v. R. Kessler & Assoc., Inc.*,
155 A.D.3d 1510 (4th Dep't 2017)....................19

*Seligson v. Chase Manhattan Bank, Nat'l Ass'n*,
50 A.D.2d 206 (1st Dep't 1975)....................22, 23, 24

*Sovik v. Healing Network*,
244 A.D.2d 985 (4th Dep't 1997)....................16

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986)....................18, 19

*Terwilliger v. Terwilliger*,
206 F.3d 240 (2d Cir. 2000)....................12

*Three Amigos SJL Rest., Inc. v. CBS News Inc.*,
28 N.Y.3d 82 (2016)....................15

*Tr. of Mosaic & Terrazzo Welfare Pension, Annuity, & Vacation Funds v. Cont'l Floors, Inc.*,
No. 13 CV 1739(ILG), 2013 WL 5637492 (E.D.N.Y. Oct. 15, 2013)....................15

*Treppel v. Biovail Corp.*,
No. 03 CIV. 3002(PKL), 2005 WL 2086339 (S.D.N.Y. Aug, 30, 2005)....................17

*Tri-Mar Contractors, Inc. v. ITCO Drywall, Inc.*,
74 A.D.2d 601 (2d Dep't 1980)....................13

*Unker v. Joseph Markovits, Inc.*,
643 F. Supp. 1043 (S.D.N.Y. 1986)....................17

*Walsh v. McGee*,
918 F. Supp. 107 (S.D.N.Y. 1996)....................7

**STATUTES**

§ 203(d) of the New York Civil Practice Law
N.Y. C.P.L.R. § 203(d)....................23

N.Y. C.P.L.R. § 215(3) ....................22

47 U.S.C. § 230(c)(1)....................21

**OTHER AUTHORITIES**

Rule 12(b)(6)....................7

Rule 56 ....................7

Defendants/Counterclaimants FEG Entretenimientos S.A. ("**Fenix Argentina**") and FEG S.A. ("**Fenix Chile**") (together, "**Fenix**") submit this Memorandum of Points and Authorities, along with accompanying Declaration of Robert E. Allen, in opposition to the Motion to Dismiss (the "**Motion**") filed by Plaintiff and Counter-Defendant Mirage Entertainment, Inc. ("**Mirage**") and Counter-Defendant Mariah Carey ("**Carey**") (together "**Counter-Defendants**").

## I.  INTRODUCTION

Mirage, Carey's "alter ego loan-out company," first filed suit against Fenix in California Superior Court on January 10, 2017.  Defs.' Answer and CounterClaims (the "**Counter-Complaint**") ¶¶ 6, 11, 15, 20, ECF No. 14.  Mirage filed its First Amended Complaint on February 24, 2017 and its Second Amended Complaint ("**SAC**") on October 16, 2017.  Notice of Removal, ¶ 3, Ex. D, ECF No. 1.

Fenix filed its Answer and Counter-Complaint to the SAC on January 17, 2018.  *See* Counter-Complaint.  Fenix brought counterclaims arising from Counter-Defendants' unlawful concert cancellations, which were cancelled through a defamatory "tweet" on October 25, 2016 by Carey to her millions of followers and via an "exclusive" interview with E! News.  *Id.*

## II.  BACKGROUND

### A.  Fenix and UTA's Pre-Existing Relationship

Fenix is a successful concert promoter in Argentina and Chile.  Counter-Complaint ¶ 10, 12.  United Talent Agency ("**UTA**") is a talent agency that acts on behalf of numerous musical performers, including Mariah Carey, to negotiate, coordinate, and contract for, among other things, live concert performances.  *Id.* at ¶ 11.  Fenix and UTA have a near ten-year working relationship, wherein the two developed a common practice with respect to executing and performing contracts and paying artists.  *Id.* at ¶ 12.  Fenix and UTA often negotiated agreements where strict adherence to payment schedules – particularly when payment dates pre-dated a fully executed agreement – was not the norm.  *Id.*  Nonetheless, the artists were always paid in-full for their performances, and the artists always performed as promised.  *Id.* at ¶¶ 12, 14.  In fact, at the

same time the events surrounding this case were playing out, UTA and Fenix were coordinating a multi-artist music festival, Personal Fest, which resulted in a successful festival and full payment to the performing artists. *Id.*

**B. The Tour Agreements**

In that spirit, Fenix and Carey, through her loan-out corporation Mirage, solely owned and operated by Carey for the purpose of furnishing her services, discussed entering into three separate form agreements. The proposed draft agreements were sent to Fenix by UTA in June 2016, for Carey to perform two concerts as part of the Latin American leg of her "Sweet Sweet Fantasy" tour. *Id.* at ¶¶ 15-16, 20-21.

Under one agreement, Contract No. 123539 (the "**Argentina Agreement**"), dated June 21, 2016, Carey agreed to headline a concert at the GEBA Jorge Newbery venue in Buenos Aires, Argentina, on October 28, 2016 (the "**Argentina Performance**"). *Id.* at ¶¶ 15-16, 18. Fenix Argentina agreed to pay Carey, through Mirage, a gross artist fee of $575,000, subject to 24.5% withholding tax, thereby resulting in a net payment to Carey of $434,125 (the "**Argentina Artist Fee**"). *Id.* at ¶ 17. Under the other two agreements, Contract Nos. 127918 and 127921 (the "**Chile Agreements**"), dated June 23, 2016 Carey agreed to headline a concert at the Movistar Arena in Santiago, Chile on October 30, 2016 (the "**Chile Performance**"). *Id.* at ¶¶ 20-21, 23. Fenix Chile agreed to pay Carey, through Mirage under Contract Nos. 127918 and 127921, a gross artist fee of $425,000, subject to a 20% withholding tax, thereby resulting in a net payment to Carey of $340,000 (the "**Chile Artist Fee**"), as well as a net payment of $175,000 for international airfare, accommodations, and cargo expenses for her band, crew, and equipment to travel to Chile. *Id.* at ¶ 22.

Neither the Argentina Agreement nor the Chile Agreements were ever executed by Counter-Defendants. *Id.* at ¶¶ 18, 23. They were partially executed by Fenix on or about September 28, 2016 – after almost four months of negotiations between the parties. *Id.* The partially executed Tour Agreements contain new material terms and evidence the ongoing nature of the negotiations between the parties. *Id.* at ¶ 26; Decl. of Jordan W. Siev in Supp. of the

Motion ¶¶ 2-4, Exs. 1-3, ECF No. 38. Thus, even though the Tour Agreements specified due dates for portions of the Argentina Artist Fee and the Chile Artist Fee (together, the "**Artist Fees**"), all of those due dates *predated* the date Fenix partially executed the Tour Agreements, and the parties neglected to update those dates during the course of the negotiation. Counter-Complaint at ¶¶ 18, 23. Furthermore, the agreement payment schedules provided due dates and payment amounts but did not express "time is of the essence" or any similar wording indicating that failure to substantially comply would result in termination of the Tour Agreements. *Id.* at ¶¶ 19, 24. Nor was payment of the Artist Fees a condition precedent to Carey's performance under the Tour Agreements. *Id.*

Each of the Tour Agreements provides a mechanism for Mirage to terminate in the event of Fenix's material breach. Paragraph 4 of Exhibit A to each of the Tour Agreements (the "**Termination Provision**") states in pertinent part:

> In the event Purchaser [Fenix] refuses or neglects to provide any of the material items or to perform any of its material obligations per the Agreement and this Exhibit A, and/or fails to timely make any of the payments as provided herein, then Artist [Carey] *shall have the right*, in addition to any other remedies which may be available to Artist at law and in equity, to refuse to perform in accordance with the terms of the Agreement, to retain any amounts theretofore paid to Artist (or Artist's designee) by Purchaser (or Purchaser's designee), and, Purchaser shall remain liable to Artist for immediate payment of the full amount of the Artist Guarantee set forth in the Agreement.

However, Paragraph 4 of Exhibit A to each of the Tour Agreements also contains the following notice and cure provision (the "**Notice and Cure Provision**"):

> In all cases Artists [sic] considers that Purchaser is in failure of its obligations Artist shall notify in written [sic] the reasons of such failure to allow Purchaser to fix within 48 hours notification.

*Id.* at ¶¶ 25-26 (emphasis added).

**C. Fenix's Payments to UTA**

At all relevant times, Fenix faithfully performed and/or substantially complied with its obligations under the Tour Agreements. *Id.* at ¶ 27. On July 20, July 21, August 25, September 2, September 30, and October 19, 2016, Fenix made payments to UTA for the benefit of Mirage.

*Id.* at ¶ 30. In particular, Fenix paid, in full, all amounts owed under the Chile Tour Agreements, as well as all applicable taxes on those amounts, over a week before the scheduled Chile Performance and five days prior to Counter-Defendants' eventual cancellation. *Id.* at ¶27. Moreover, at the time that Counter-Defendants cancelled Carey's performances on October 25, 2016, Fenix had wired a total of $703,100 to UTA in connection with all of the Tour Agreements – nearly 75% of all funds due under all of the Tour Agreements. *Id.*

**D. Counter-Defendants Fail to Give Fenix Notice of Cancellation**

During the weeks leading up to the Argentina Performance and Chile Performance, Fenix Argentina, who had been preparing for the Personal Fest concerts (which involved four other UTA artists and was set to occur a few days before the Argentina Performance), engaged in numerous email and telephone communications with UTA. *Id.* at ¶ 31. Moreover, in the months during the negotiations of the Tour Agreements, Fenix communicated with UTA and Mirage on a number of occasions concerning the timing of payments and the logistics and marketing of the Argentina and Chile Performances, which required Fenix's preparation. *Id.* at ¶ 32. At no time during those communications did Counter-Defendants alert Fenix that Carey was going to cancel her performances absent immediate payment of any outstanding amounts due. *Id.* at ¶ 31; Decl. of Robert E. Allen in Supp. Of Counterclaimants' Opp. to the Motion ¶¶ 8, 10, 12 14-16. In fact, Fenix reasonably concluded from the communications that Fenix Argentina had paid all of the monies due under the Argentina Tour Agreement—UTA had complained about (and only about) the possible underpayment to four artists set to perform at Personal Fest. Motion at ¶¶ 28, 30-33. All payments made by Fenix were accepted without objection, as was consistent with the past practices between the parties. *Id.* at ¶ 30.

Further, Mirage accepted the partially executed Agreements that Fenix sent at the end of September, and neither Mirage nor UTA indicated that they would not be fully executed. *Id.* at ¶¶ 18, 23; *see also* Siev Decl. ¶¶ 2-4, Exs. 1-3. In fact, those Agreements were relied upon by Plaintiffs to sue Fenix in this action.

**E. Carey Wrongfully and Without Notice Fails to Perform**

The week immediately prior to the Argentina and Chile Performances, as Fenix attempted to coordinate the final logistics for the concerts, UTA, Mirage, and Carey—without any warning (much less explanation)—abruptly cut off communications with Fenix. *Id.* at ¶ 34. Fenix attempted to reach Carey's team directly and through UTA, while expressing the urgency of their correspondence, by relaying that several thousand dollars of final promotions were planned and that any potential reschedule needed to be communicated immediately. *Id.* At the same time, Fenix heard reports that Carey was having problems with the Brazil market on her South America tour, and that those shows, and the tour collectively, may no longer be as lucrative as Carey had hoped. *Id.* at ¶ 35. Accordingly, Fenix emailed UTA on October 24, 2016, stating "[w]e are aware that you may be having some issues on another market of the Tour and we would like to express that we are here to help." *Id.* Having received no notice that Carey intended to cancel her performances, Fenix dutifully, and as was expected of them under the Tour Agreements, sent transportation to the airport to pick up part of Carey's team on their scheduled arrival date. *Id.* at ¶¶ 33, 36. To Fenix's complete surprise, no one from Carey's team showed up. *Id.* at ¶ 36.

Then, to add insult to injury, on October 25, 2016—a *mere three days prior* to the date of the Argentina Performance—Fenix was shocked to see in the media that Carey was unilaterally cancelling both the Argentina and Chile Performances. *Id.* at ¶ 37. A day later, Carey's production manager, Michael Morobitto, confirmed the media reports in an apologetic email to Fenix (the "**Morobitto Email**"):

> I'm so sorry to start your day with bad news. It is true that we have canceled the S. America portion of our tour. I want you to know ASAP so you don't waste any time, money or resources on our arrival. There were many factors that went into the decision and it was not an easy one to make. You have been more than cooperative throughout this advance & I appreciate your dedication and professionalism!
>
> Please feel free to contact me if you feel the need and I will help as much as I can.

*Id.* at ¶ 38. The Morobitto Email is clear that neither Mirage nor Carey cancelled the performances because of lack of payment and that Fenix was in no way at fault for Carey's

eleventh-hour cancellation. *Id.* In fact, Mr. Morobitto thanks Fenix for their "dedication and professionalism" and apologizes for the eleventh-hour cancellation. *Id.* On October 27, 2016, right after Counter-Defendants' wrongful termination, UTA, on Mirage and Carey's behalf, returned to Fenix $667,924 of the money paid under the Tour Agreements, further indicating that Counter-Defendants, not Fenix, were at fault for cancelling the performances. *Id.* at ¶ 39.

**F. Carey Defames Fenix by Falsely Blaming It for the Wrongful Cancellation Via Twitter and Media Blasts**

On the day of the media reports announcing Mirage and Carey were cancelling the Argentina and Chile Performances, and blindsiding Fenix in the process, Carey released a public statement—which she tweeted to her 16.8 million Twitter followers (the "**Tweet**"). The Tweet falsely suggested that the Argentina and Chile Performances, along with three of her shows in Brazil that Fenix had no hand in booking, were cancelled because of so-called "promoter negligence." *Id.* at ¶ 41. Carey went on to insinuate that Fenix had somehow mistreated concertgoers in South America stating:

> Devastated my shows in Chile, Argentina & Brazil had to be cancelled. My fans deserve better than how some of these promoters treated them.

*Id.* The Tweet contained a link to an "Exclusive" story published by E! News containing the headline "MARIAH CAREY CANCELS PART OF HER LATIN AMERICA TOUR CITING PROMOTER NEGLIGENCE." *Id.* at ¶ 42. That story further repeated and spread Carey's false statements, stating:

> E! News can exclusively confirm that the "We Belong Together" singer has been forced to cancel her upcoming dates in Brazil, Argentina and Chile due to promoter negligence.

*Id.* The story concludes by directly quoting a statement Carey gave to E! News. Motion at 19, ECF No. 39.

As a result of the false negative press, Fenix's reputation in its industry has suffered greatly causing economic harm that continues today. Counter-Complaint at ¶¶ 44-45, 68-69.

## III. ARGUMENT

Counterclaimants have plausibly pleaded facts demonstrating their entitlement to relief for breach of contract and defamation, which caused injury to Fenix. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering the sufficiency of a complaint, the Court is obligated to (i) accept all factual allegations of a complaint as true, (ii) construe all factual allegations favorably to the pleading party, and (iii) draw all reasonable inferences in favor of the pleading party. *Iqbal*, 556 U.S. at 678. Unsurprisingly, Rule 12(b)(6) motions are viewed with disfavor and are rarely granted. *Walsh v. McGee*, 918 F. Supp. 107, 112 (S.D.N.Y. 1996).

### A. Counter-Defendants' Motion to Dismiss Inappropriately Relies Upon Extraneous Documents and Raises Factual Disputes

A motion to dismiss brought under Rule 12(b)(6) challenges the "legal feasibility" of a complaint rather than testing its substantive merits or disputes regarding factual underpinnings (such challenges are reserved for Rule 56 motions). *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016). Rule 12(b)(6) does not give the district court authority to consider matters outside the pleadings. *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991). This limits a court to restrain its consideration to (i) the facts stated on the face of the complaint, (ii) documents appended to the complaint or incorporated by reference, and (iii) matters of which judicial notice may be taken. *Id.* Merely mentioning a document in the complaint is not sufficient to satisfy this standard. *Id.* Offering limited quotations from the document is likewise insufficient to permit court review and consideration. *Id.* Moreover, in most instances where the "incorporated by reference" exception is triggered, thereby allowing the court to look beyond the complaint, the incorporated material is a contract or other legal document that contains obligations upon which the plaintiff's complaint stands or falls. *Id.*

Despite this black-letter law, Counter-Defendants' premise their Motion on six (out of at least 23) hand-picked, heavily redacted emails containing hearsay statements, whose substance is not only lacking in all evidentiary foundation, but is also taken out of context. Motion at 6-7;

Siev Decl., ¶¶ 5-10, Exs. 4-9; Allen Decl., ¶¶ 7-12. And, even if considered, those statements fail to support Counter-Defendants' suggestion that proper notice was given to Fenix under the Notice and Cure Provision, justifying Carey's last-minute cancellation. Moreover, the emails are not from Mirage, but UTA who is not authorized to speak for Mirage under the Agreements and fail to unequivocally demand a payment and deliver notice that failure to do so will result in cancellation of the performances. Allen Decl., ¶¶ 14-16. At best, the hearsay and incomplete statements comprise equivocating and generalized complaints about the timing of payments – which ultimately were accepted by Counter-Defendants, and returned to Fenix in an apology for Carey's abrupt cancellation. Counter-Complaint ¶ 39; Allen Decl., ¶¶ 5, 8-9, 11.

**1. The Counter-Complaint Does Not Rely On Counter-Defendants' Emails**

To justify their attempt to have this Court consider material outside of the pleadings, Defendants point to three inapposite cases to suggest that the Counter-Complaint "relies on" their self-selected emails. Motion at 9-12. But Counter-Defendants misinterpret the authorities, as two of them stand for incorporation of extraneous documents only when a plaintiff makes specific reference to or quotes directly from specific individual documents, while the third directly contradicts Counter-Defendants' position.

In *Rapoport v. Asia Elec. Holding Co.*, the court deemed an extraneous *Washington Post* article and an investment prospectus to be incorporated by reference into the complaint after the plaintiff specifically quoted from both and the alleged fraudulent statements were contained in the prospectus itself. 88 F. Supp. 2d 179, 181-85 (S.D.N.Y 2000). Likewise in *Matusovsky v. Merrill Lynch*, the Court considered the extraneous document because that individual document was "explicitly referred to" in the complaint even being referred to by its title. 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

Contrary to Counter-Defendants' position, *Williams v. Citibank, N.A.* supports the notion that extraneous emails should not be considered by the court. 565 F. Supp. 2d 523 (S.D.N.Y. 2008). In *Williams*, plaintiff had alleged defendants engaged in unlawful debt collection

practices, accusing the defendants of mailing threatening collection letters, but without referring to the dates of the letters, quoting the letters, or indicating the total number of letters received. *Id.* at 526. In opposition to a motion to dismiss, the plaintiff submitted an affidavit, attaching a specific, individual collection letter to support his opposition. *Id.* at 531. The court reasoned the letter was neither integral nor part of the complaint and could not be considered in connection with the motion to dismiss, despite the fact that the plaintiff had pleaded his receipt of letters generally and that they were intended to collect on debt. *Id.* Likewise here Counter-Defendants presented the self-selected emails, which are neither integral to the allegations that notice was not given nor incorporated in or specifically relied on in the Counter-Complaint.

**2. General Reference to Correspondence or Knowledge of its Existence is Insufficient to Incorporate Documents into the Counter-Complaint**

Counter-Defendants also attempt to introduce the emails as a basis for dismissal on the pleadings by arguing that the emails were known to Fenix, contradict Fenix's claims, or are the basis for Fenix's first and second claims. Motion at 5 at n.3. However, this inconsistent argument is meritless. The fact that the emails purportedly "contradict" Fenix's allegations, is no more than a factual dispute. Despite the fact that Counter-Defendants believe they can overcome Fenix's allegations supporting breach of contract with their own evidence (if such emails are even admissible) Fenix has sufficiently alleged that Counter-Defendants breached the Agreements by cancelling Carey's scheduled performances without notice. Counter-Complaint ¶¶ 30-31, 37-38, 40. The plausibility of Fenix's claim is based on the pleaded facts that Counter-Defendants (1) accepted all payments made by Fenix, and (2) returned those payments with an apology after Carey failed to notify Fenix and cancelled the tour at the last minute without justification. *Id.* at ¶¶ 30-31, 37-40.

Counter-Defendants cite *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991), but it is inapplicable. Motion at 5, 12. In *Cortec Industries* the extraneous offering memorandum and stock purchase agreement made the very representations upon which plaintiff relied to support his fraud claim. *Id.* at 45. That is not the case here. Fenix disputes that

Counter-Defendants' submitted emails state or were understood to state what Counter-Defendants argue. In fact many have nothing to do with Mariah Carey. Allen Decl., ¶¶ 5, 12. Thus, they cannot be used as "proof" of notice to cure purported material breach of the Chile Agreements. Moreover, *Cortec Industries* is further inapplicable as it is illustrative of the exception to the general bar on considering documents outside the complaint. *Compare Goel*, 820 F.3d at 559 ("In most instances where this exception is recognized, the incorporated material is a contract or other *legal document*….") (citation and quotation marks omitted) (emphasis added) *with Cortec Indus.*, 949 F.2d at 47 (explaining that a district court "may review and consider public disclosure documents required by law"). Finally, Counter-Defendants' reliance on *Jovani Fashion, Ltd. v. Cinderella Divine, Inc.*, is not on point. In *Jovani Fashion*, the Court granted a motion to dismiss after considering the facts pleaded in the complaint as well as an image of an allegedly copyright infringing dress that was attached to the complaint – not extraneous. 808 F. Supp. 2d 542, 544, 549 (S.D.N.Y. 2011).

*DiFolco v. MSNBC L.L.C.* is instructive. In *DiFolco*, the court overturned the dismissal of plaintiff's claims where the district court relied on correspondence that was not attached, incorporated by reference, or referred to in the complaint. 622 F.3d 104, 106, 112-13 (2d Cir. 2010). The appellate court admonished the district court for evaluating contradicting extraneous evidence and thereby engaged in "[assaying] the weight of the evidence which might be offered in support [of the complaint]," resulting in improperly choosing between reasonably competing interpretations of evidence. *Id.* at 113.

In any event, Fenix should be entitled to obtain discovery concerning the emails, have the court rule on evidentiary objections to their admissibility, to cross-examine the purported speakers, and to present countervailing evidence of its own so that the Court can weigh all of the evidence. These emails are part of an incomplete chain of communications, are out-of-court statements submitted to prove the truth of notice, are taken out of context, and contain significant redactions that hide their true meaning. Motion 6-7; Siev Decl., ¶¶ 5-10, Exs. 4-9; Allen Decl., ¶¶ 6-7, 9-10.

**B. Fenix's Breach of Contract Counterclaims Are Plausible**

Counter-Defendants' improper attempt to rely on extrinsic, untested "evidence" to challenge Fenix's facts alleging Counter-Defendants' breach of contract highlights the paucity of their position. In fact, the Counter-Complaint alleged sufficient facts to plausibly allege each element of a breach of contract claim in New York: (1) the existence of contracts requiring Carey to perform or to give Fenix 48-hour notice of a material breach of the Tour Agreements and opportunity to cure before cancelling a concert (Counter-Complaint ¶¶ 15-26, 47, 55); (2) Fenix's performance pursuant to the contract (*Id.* at ¶¶ 27-28, 32-33, 36, 48, 56); (3) Counter-Defendants' breach of their contractual obligations by failing to perform and failing to notify Fenix of a material breach and providing opportunity to cure (*Id.* at ¶¶ 34-40, 49-52, 57-60); and (4) damages resulting from the breach (*Id.* at ¶¶ 33, 53, 61). *See Canzona v. Atanasio*, 118 A.D.3d 837, 838 (2d Dep't 2014).

First, Fenix alleged the existence of three contracts between the parties, the Tour Agreements, as well as the terms of those contracts that required Carey to perform two concerts, the payment terms of the contracts, the termination clause, and the Notice and Cure Provision. Counter-Complaint ¶¶ 15-26, 29, 47, 55.

Second, contrary to Counter-Defendants' assertions, Fenix does not concede that they failed to timely make payments or that they did not pay the full Artist Fees. Motion at 11. Fenix alleged facts that it paid all monies due under the Chile Agreement, and substantially all money under the Argentina Agreement. Counter-Complaint ¶¶ 18-19, 23-24, 27, 30, 48, 56. Fenix further alleged that it believed it had paid all amounts due under the Argentina Agreement, as days before the Argentina Performance Fenix was in contact with UTA who complained about (and only about) the possible underpayment of four artists set to perform at Personal Fest. *Id.* at ¶¶ 28, 48, 56; Allen Decl., ¶¶ 8-9. Moreover, Fenix alleged that it performed by arranging promotional efforts, paying taxes, and coordinating local ground transportation for Counter-Defendants. Counter-Complaint at ¶¶ 27-28, 36, 48, 53, 56, 61.

The authorities relied upon by Counter-Defendants, *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003), and *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000), are inapplicable. A party cannot agree to make payments on dates that have already passed when executing the very agreement that binds them to make those payments. The fact that the parties conducted themselves in the absence of an executed contract demonstrates the necessity to look beyond the contract itself and evaluate the prior and ongoing conduct of the parties to understand their obligations.

Third, Fenix alleged that Counter-Defendants breached the Agreements, namely Carey's refusal to perform, unlawful, eleventh-hour cancellation of the concerts, and Mirage's failure to provide adequate notice and opportunity to cure if Mirage considered Fenix to be in material breach. Counter-Complaint at ¶¶ 29, 31-32, 37-38, 40, 49-52, 57-60.

Fourth, Fenix alleged the damages resulting from Counter-Defendants' breach, including its loss of reputation in its industry, loss of profits, loss of out-of-pocket expenditures incurred in good faith under the Tour Agreements, and taxes paid. *Id.* at ¶¶ 27, 33-34, 44, 53, 61. Accordingly, Fenix has alleged sufficient facts to demonstrate that Counter-Defendants are liable for breach of contract.

**1. Counter-Defendants Failed to Provide Notice of Fenix's Alleged Failure to Perform**

Counter-Defendants' sole "defense" to Fenix's allegations of breach, notwithstanding the Notice and Cure Provision, is based on Counter-Defendants' cherry-picked, heavily redacted emails, taken out of the context from several communications regarding several artists' concerts in addition to Carey's. These emails contain hearsay and unauthenticated statements by UTA (who under the Agreements is not a party who can give notice but rather considered solely a booking agent of Mirage [and thereby Carey] but with no authority to bind Mirage or act on its behalf). *See* Counter-Complaint ¶¶ 25-26; Motion at 11-12; Allen Decl., ¶¶ 14-16. Even still, none of these emails demonstrate that either Mirage or Carey provided adequate notice that

Fenix was in violation of its material obligations, that it had 48 hours to cure, and that in the absence of cure, Counter-Defendants would cancel.

Moreover all of the facts pleaded in the Counter-Complaint demonstrate that Fenix had not materially breached the Tour Agreements, and there would be no basis for the Notice. First, as had been done under previous contracts during the course of previous dealings, Counter-Defendants accepted off-schedule payments from Fenix, without threat of cancellation. Counter-Complaint ¶¶ 30-32. Second, the Tour Agreements were not executed or final at the time the payments were scheduled to be do. Siev Decl., ¶¶ 2-4, Exs. 1-3. Third, Fenix indeed performed or substantially performed under the Tour Agreements by making the required payments. Counter-Complaint ¶¶ 27-28, 48, 56. Importantly, whether the payments were "late" is of no consequence under the Tour Agreements and do not constitute material breaches as a matter of law. "Absent an express contract provision providing that time is of the essence, if one party acquiesces in the other's late payments throughout the period of the contract, the tardy party is entitled to *unequivocal notice* that timely payment will be required in the future." *Tri-Mar Contractors, Inc. v. ITCO Drywall, Inc.*, 74 A.D.2d 601, 602 (2d Dep't 1980) (emphasis added). Counter-Defendants failed to provide unequivocal notice. Their retroactive "complaints" about late payments, after they breached the Tour Agreements by cancelling the performances, cannot convert allegedly late payments into material breaches, notwithstanding their additional failure to comply with the Notice and Cure Provision.

**2. Carey Need Not Be Party to the Tour Agreements to be Held Liable for the Breach**

Under New York law, a non-party may be held liable under a contract if the plaintiff pierces the corporate veil and shows that the nonparty is the alter ego of the contracting party. *Donald Dean & Sons, Inc. v. Xonitek Sys. Corp.*, 656 F. Supp. 2d 314, 321 (N.D.N.Y. 2009). In order to pierce the corporate veil, a plaintiff must allege that (i) the owner exercised complete domination over the corporation with respect to the transaction at issue and (ii) that such domination was used to commit the wrong that injured the plaintiff. *Accordia Ne., Inc. v.*

*Thesseus Int'l Asset Fund, N.V.*, 205 F. Supp. 2d 176, 181 (S.D.N.Y. 2002). Among the factors considered when evaluating complete domination of the corporate form are overlap in ownership, officer, directors, and personnel, commingling of assets, and failure to observe corporate formalities (e.g. holding shareholder or board meetings) such that the corporation is a mere instrumentality, agent, and alter ego of the owner. *Id.*; *Donald Dean & Sons*, 656 F. Supp. 2d at 321. Most notably, alter ego arguments are "fact-laden claim[s]" that are particularly unsuited for resolution on summary judgment, let alone motion to dismiss. *Donald Dean & Sons*, 656 F. Supp. 2d at 321-22. Courts applying New York law indicate that maintaining a shell corporation whose only purpose is to be a party to agreements may give rise to holding a non-party liable under an agreement. *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 316 (S.D.N.Y. 2003). Moreover, a contract may be enforced against a non-party when the non-party accepted the written agreement and acted upon it. *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 272 (S.D.N.Y. 2009).

Counter-Defendants' lone argument against the alter ego relationship is that it need not be accepted as true by the Court, as it is a "legal conclusion." To support this argument, Counter-Defendants cite only to *Twombly* and *Iqbal*, but offer no analysis on construing alter ego allegations as a legal conclusion. Counter-Defendants do not directly address the alter-ego relationship alleged in the Counter-Complaint.

First, Fenix alleged overlap of corporate officers and employees, noting that Carey is the Chief Executive Officer and is believed to also be the Chief Financial Officer, Secretary, and sole shareholder of Mirage. Counter-Complaint ¶¶ 7-9, 11. Second, Carey is alleged to dominate and control the business and financial decisions of Mirage for her sole personal benefit. *Id.* Third, Mirage is alleged to be the personal loan-out company for Carey, created solely to function as her corporate alter ego and enter into agreements on her behalf and for her services, signing agreements "F/S/O Mariah Carey" or "for services of Mariah Carey." *Id.* at ¶¶ 6-9, 11, 15 n.2. Fourth, Carey alone is alleged to have been the one controlling the cancellation, as evidenced by the Tweet and statement provided to E! News as well as email from Carey's manager, giving rise

to the harm under the contracts at issue. *Id.* at ¶¶ 37-38, 41-42. All of these allegations are sufficient to state a well-pleaded allegation of an alter ego relationship between Mirage and Carey. *Tr. of Mosaic & Terrazzo Welfare Pension, Annuity, & Vacation Funds v. Cont'l Floors, Inc.*, No. 13 CV 1739(ILG), 2013 WL 5637492, at *5-6 (E.D.N.Y. Oct. 15, 2013).

Accordingly, Fenix has plausibly pleaded all elements of breach of the Tour Agreements by Counter-Defendants.

### C. Fenix Alleged Plausible Defamation Counterclaims

In order to plead a defamation claim a plaintiff must allege: (1) a false statement; (2) published without privilege or authorization to a third party; (3) constituting fault as judged by, at a minimum, a negligence standard; and (4) causing special harm or defamation per se. *Matter of Konig v. CSC Holdings, LLC*, 112 A.D.3d 934, 935 (2d Dep't 2013). If upon any reasonable view of the stated facts, the pleading party would be entitled to recovery for defamation, the complaint must be deemed sufficient to state a cause of action. *Davis v. Boeheim*, 24 N.Y.3d 262, 268 (2014).

#### 1. Fenix Alleged Counter-Defendants Published False Statements About Fenix

Fenix satisfied the false statements element. First, Carey tweeted a statement, implicating that Fenix was at fault for the cancellation of her concerts, which was not true. Counter-Complaint ¶¶ 41, 63, 66-67 (quoting both the Tweet and the E! News story). Further, Fenix satisfied the publication element by alleging facts indicating publication of the false statements through Twitter, E! News, and Billboard. *Id.* at ¶¶ 41-43, 45, 65, 68-69; *Levy v. Smith*, 132 A.D.3d 961, 961-62 (2d Dep't 2015) (statements in defendant's press releases and an "exclusive" interview were actionable for a claim of defamation).

The fact that Fenix was not mentioned by name is irrelevant. *Three Amigos SJL Rest., Inc. v. CBS News Inc.*, 28 N.Y.3d 82, 86 (2016) (Plaintiff need only "plead and prove that the statement referred to them and that a person hearing or reading the statement reasonably could have interpreted it as such."). Fenix alleged facts to establish that the statement was about Fenix. Specifically, Fenix was the sole promoter for two of the three venues on the Tour mentioned by

Carey in the Tweet, and the statements were understood by third parties to be about Fenix. Counter-Complaint ¶¶ 45, 64, 68-69.

Counter-Defendants' reliance on *Anyanwu v. Columbia Broad. Sys., Inc.*, is misplaced. The defamatory statements there referred generally to a race of people who engaged in international business across the entire United States, a class estimated to exceed 500 people. 887 F. Supp. 690, 692-93 (S.D.N.Y. 1995). Here, the defamatory statements refer to specific business entities engaged in a specific trade in three specific countries for concerts Carey was scheduled to perform. This class of three is sufficiently limited to raise a factual issue as to whether the defamatory statement is of and concerning Fenix. *See Sovik v. Healing Network*, 244 A.D.2d 985, 987-88 (4th Dep't 1997) (whether statement was concerning plaintiff when he was one out of a class of 15 in the entire country).

Courts have allowed individuals to pursue defamation claims "where they were identified as a member of a group of less than sixty." *Anyanwu*, 887 F. Supp. at 693. If the words of the defamatory statement "may by any reasonable application, import a charge against several individuals, under some general description or general name [e.g. 'these promoters' in Argentina, Chile, and Brazil], the plaintiff has the right to go on to trial, and it is for the jury to decide, whether the charge has the personal application averred by the plaintiff." *Id.* (quoting *Gross v. Cantor*, 270 N.Y. 93, 96 (1936)) (information in brackets added for emphasis of applicability).

**2. Fenix Alleged Fault of Counter-Defendants and Damages**

Next, Fenix established the third element by alleging Carey provided a statement to E! News in which she claimed that she was forced to cancel her Latin American concerts because of "promoter negligence," and then tweeted a link to the E! News story, even though she knew such statements were false and inconsistent with statements provided in the Morobitto Email. Counter-Complaint ¶¶ 37-38, 41-43, 45, 63-64, 66-67. Finally, Fenix alleged facts demonstrating fault, specifically alleging facts to support that Counter-Defendants knew the statements were false or acted in reckless disregard of the truth. *Id.* at ¶¶ 38, 40, 66-67. Fenix alleged special and per se damages, specifically alleging facts indicating that the statement

caused Fenix harm in their trade, business, or profession. *Id.* at ¶¶ 43, 45, 68-69; *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 177 (2000) ("The gravamen of an action alleging defamation is an injury to reputation."). Counter-Defendants' assertion that Fenix failed to allege a connection between Counter-Defendants' statements and the calls Fenix received from clients ignores Fenix's allegations that third parties heard the statements and hired Fenix's competitors to promote their concerts instead. Counter-Complaint ¶¶ 43, 45, 65, 68. This is sufficient to constitute allegations that the statements caused Fenix not only special harm but per se damages as the statements related to Fenix's trade, business, or profession. *See Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001).

**3. Mirage and Carey Are Alleged Alter-Egos and Cannot Escape Liability for Acts of the Other**

Counter-Defendants are sufficiently pleaded to be alter-egos of one another thereby prohibiting one party from escaping liability for the actions of the other. *See* Section III(G)(2) *supra*. That is to say, Carey cannot conduct misdeeds and pass them off as acts of Mirage so as to avoid liability and vice versa. Such evasive and fraudulent behavior is exactly the behavior alter ego liability is intended to forestall.

As Counter-Defendants themselves note, a defamation claim requires an allegation that the accused participated in the creation or publication of the defamatory statements. *Treppel v. Biovail Corp.*, No. 03 CIV. 3002(PKL), 2005 WL 2086339, at *3 (S.D.N.Y. Aug, 30, 2005). But as *Treppel* acknowledges, "a corporation can only speak through its officer, employees and authorized agents," and Fenix alleged, as part of the facts supporting the alter-ego theory, that Carey is the Chief Executive Officer, Chief Financial Officer, and Secretary of Mirage. *Treppel*, 2005 WL 2086339, at *3; Counter-Complaint ¶¶ 6. "A corporation may be held liable for the defamatory utterances made by its officer or agent, acting within the scope of [her] authority.... [and] [t]he question of authority is a factual one." *Unker v. Joseph Markovits, Inc.*, 643 F. Supp. 1043, 1049 (S.D.N.Y. 1986) (denying a motion to dismiss plaintiff's claims seeking to hold corporation liable for defamatory remarks of its president).

**4. Fenix Seeks to Hold Counter-Defendants' Liable for Their Statements, Not Those of Third Parties**

E! News reported that Carey "cancels part of her Latin American Tour, citing Promoter Negligence." Counter-Complaint ¶ 42. On its face, the article states that *Carey*, not Mirage, cancelled the Tour, and that *Carey* stated that it was because of "promoter negligence." The only logical conclusion is that Carey made the statement to E! News on behalf of Mirage. Counter-Defendants' factual argument that they did not make this statement is implausible and contrary to the plain meaning and circumstances surrounding the article. Counter-Defendants further suggest that the Tweet is not actionable because reference to an article or linking to someone else's post does not constitute republication. Motion at 21-21 (citing *Enigma Software Grp. SA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263 (S.D.N.Y. 2016) and *In re Philadelphia Newspapers, LLC*, 690 F.3d 161 (3d Cir. 2012)). However this ignores that Fenix alleged *Carey* published the statements by (i) making the promoter negligence statement to E! News, which the E! News article repeated suggesting the connection between Carey and the "promoter negligence" term in the story and (ii) publishing the Tweet which contained its own actionable defamatory statement (addressed *infra* III(H)(5)). Counter-Complaint ¶¶ 41-42; *compare Levy*, 132 A.D.3d at 962-63 ("[F]acts alleged in the complaint were sufficient to permit a reasonable inference that the appellant intended and authorized the republication of the allegedly defamatory content of the press released in the news articles….") *with In re Philadelphia Newspapers*, 690 F.3d at 175 (mere reference to an article is not republication "as long as it does not restate the defamatory material"). The result is that the parties have alleged two different sets of facts. Resolving the disputed allegations would be improper on a motion to dismiss as the Court must accept Fenix's facts as true and construe the Counter-Complaint in the light most favorable to Fenix.

**5. Carey's Statements Are Actionable Defamation, Not Pure Opinion**

The Tweet is a statement of "mixed opinion" because it implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing. *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986). A statement of pure opinion is one that states either (i) an opinion

and is accompanied by a recitation of facts upon which it is based, or (ii) an opinion not accompanied by a factual recitation so long as the statement "does not imply that it is based upon undisclosed facts." *Id.* A pure opinion is not actionable, but statements of "mixed opinion" are because they imply that the speaker knows certain facts, unknown to her audience, which are detrimental to the person about whom she is speaking. *Id.*

New York courts developed factors to determine whether a reasonable reader would consider whether a statement connotes fact or non-actionable opinion. *Boeheim*, 24 N.Y.3d at 270. These factors require the court to take a holistic approach by considering the communication as a whole, its tone, and apparent purpose. *Id.* at 270-71. In interpreting alleged defamatory words, courts must give the language a fair reading, refrain from straining to interpret the words in their mildest and most inoffensive sense, and construe the words not as precise lawyers and judges but rather as they would be understood *by the public to which they are addressed. Celle*, 209 F.3d at 177-78.

Applying these factors, it becomes clear that the Tweet is actionable mixed-opinion. First, the Tweet and statement to E! News imply facts unknown to the audience that are suggested to justify the opinion. "My fans deserve better than how some of these promoters treated them suggests a precise meaning of improper behavior by Fenix against Carey and her fans. It implies malfeasance by Fenix and provides justification for Carey's feeling of "devastation" and, ultimately, her cancellation. This statement is "reasonably susceptible of a defamatory connotation" and is thus actionable. *See, e.g., Sallustio v. R. Kessler & Assoc., Inc.*, 155 A.D.3d 1510, 1511 (4th Dep't 2017) (statement "R. Kessler screwed us beware" was actionable mixed opinion).

Further, Counter-Defendants concede that the Tweet may be susceptible to more than one meaning. Motion at 18-19. Such fact precludes the dismissal of the defamation claim because only the trier of fact may make that determination of whether the statement was defamatory. *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) (If "the court determines that the words are susceptible of more than one meaning, it is then for the trier of fact, not for the court acting on

the issue solely as a matter of law, to determine in what sense the words were used and understood."). In fact, the *Davis* court, in finding that the phrase "I do not recommend these people" as potentially libelous, adopted the New York Court of Appeals admonition not to interpret writings "in their mildest and most inoffensive sense in order to hold them non-libelous." *Id.* at 83 (internal citation and quotation marks omitted).

Second, when viewing the Tweet and E! News article in full context, it is clear that Carey was relying on undisclosed facts. The Tweet only provides that the shows "had to be cancelled" but the statement that promoters "treated" Carey's fans in some way (here, negatively) implies that there are undisclosed facts as to what that treatment was. Taken in context with the E! News story a reader becomes aware that Carey cancelled due to "promoter negligence" – a conclusion suggesting further undisclosed facts. It is this reliance on undisclosed facts that makes the statements mixed opinion and actionable. *Boeheim*, 24 N.Y.3d at 272-73.

Counter-Defendants assert that Carey's Tweet is pure opinion because it conveys Carey's feelings about cancelling her concerts and is thus readily understood as speculation, citing *Levin v. McPhee*, 119 F.3d 189 (2d Cir. 1997). Motion at 18-19. But the *Levin* court made clear that "[t]hough some statements may be characterized as hypothesis or conjecture, they may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader." *Id.* That is exactly what Carey did in her Tweet by failing to disclose the underlying facts. Counter-Defendants also parse out and evaluate the Tweet word-for-word, but that is exactly what a court is *not* to do. *Id.* ("Instead of parsing out and evaluating the challenged statements in isolation, New York courts look to the immediate context and the broader social context of the statement and evaluate the impact that the statements would have on a reasonable reader.") (internal citations omitted).

Applying a holistic approach is exactly what the court did in *Live Face on Web, LLC, v. Five Boro Mold Specialist Inc.*, No. 15 CV 4779-LTS-SN, 2016 WL 1717218 (S.D.N.Y. Apr. 28, 2016) when it determined that, read in context, the defendant's statements were pure opinion because they (1) "[called] into question the legitimacy of litigation," (2) were "hyperbolic and

imprecise," and (3) used rhetorical indicators such as "one can only ascertain" and "what could be construed," which the reader understood was opinion, not fact. *Id.* at *2-3. The Court began its analysis immediately noting that the statements were made in the context of litigation, subjecting them to classification and understanding as pure opinion. *Id.* at *2. But Carey's statements are not analogous. The key question, ignored by Counter-Defendants, is "whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff." *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008) (citation and quotation marks omitted). The Tweet, especially when combined with the linked article, raises the "reasonably susceptible of a defamatory connotation" and is therefore actionable. *Boeheim*, 24 N.Y.3d at 268.

**6. The Communications Decency Act Safe-Harbor is Inapplicable**

Counter-Defendants attempt to rely on The Communications Decency Act (the "**Act**") to assert that Carey's use of Twitter to disseminate the defamatory language insulates her from liability. Motion at 19-20; 47 U.S.C. § 230(c)(1). However, the applicability of the Act requires the Court to accept Counter-Defendants' statement of facts: that Carey did not make the actual defamatory statements to the press, and ignore Fenix's (as well as the plain language of the E! article). Counter-Complaint ¶¶ 41-43. Such counter-factual argument is improper on a motion to dismiss. *LaBounty*, 933 F.2d at 123. Accordingly Counter-Defendants' argument on the applicability of *Ricci v. Teamsters Union Local 456*, 781 F.3d 25 (2d Cir. 2015) becomes moot.

Furthermore, a party may not seek protection under the Act when that party, here Carey, participates in the development of the content at the center of the dispute and is being held accountable for its conduct rather than for the content of information offered. *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 175-77 (2d Cir. 2016) (defendant held accountable for its own conduct – participating in the development of the fake news articles and providing edits – which allowed others to ultimately publish the deceptive statements). Here, as in *LeadClick*, Carey is not being charged with republishing content of another, but rather providing defamatory information to E! News in an exclusive interview. *See Haefner v. New York Media,* LLC, 82

A.D.3d 481, 482 (1st Dep't 2011) (plaintiffs complaint dismissed only because the defamatory link was not "alleged to have been effected with the defendants' acquiescence or participation"). Accordingly, the Act does not afford Carey the safe harbor she seeks.

### 7. Fenix's Defamation Claim is Timely

Fenix's defamation counterclaim is not barred by the statute of limitations as it was not barred at the time Mirage originally filed this action on January 10, 2017. The statute of limitations for a defamation claim is one year. N.Y. C.P.L.R. § 215(3). Section 203(d) of the New York Civil Practice Law and Rules provides in pertinent part:

> A defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed, except that if the defense or counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed.

A claim asserted in the complaint is "interposed" upon filing, meaning that "the timeliness of [] counterclaims must be ascertained as of the date on which the complaint was filed…." *Id.* at § 203(c); *Amendola v. Kendzia*, 17 A.D.3d 1105, 1108 (4th Dep't 2005).

Mirage filed its initial complaint on January 10, 2017 thereby interposing its original claims as of that day. Counter-Defendants' alleged defamation occurred on October 25, 2016, less than one year prior to the date of Mirage filing its complaint on January 10, 2017. Therefore, on the date Mirage interposed the original claims in this matter, Fenix's claim for defamation was not time-barred under Section 203(d). As Mirage initiated this action, Fenix has been called upon to defend itself, making Section 203(d) available for Fenix's counterclaims. *See 118 East 60th Owners, Inc. v. Bonner Properties*, 677 F.2d 200, 203 (2d Cir. 1982) (noting that escape from a time bar is available "to a party that is called upon to defend"); *see also Seligson v. Chase Manhattan Bank, Nat'l Ass'n*, 50 A.D.2d 206, 209-10 (1st Dep't 1975) (noting counterclaims are asserted by "one or more defendants against one or more plaintiffs and other persons alleged to be liable").

Counter-Defendants content that Section 203(d) cannot be relied upon by Fenix because (i) there lacks a "close nexus" between Fenix's defamation counterclaim and Mirage's breach of contract claims and (ii) Carey was not a plaintiff to the original complaint or the SAC.

The language of Section 203(d) is plain and clear that a "counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed." N.Y. C.P.L.R. § 203(d). The language relied on by Counter-Defendants that follows sets forth the "close nexus" test, which applies *only* to save a counterclaim "that [] was barred at the time the claims asserted in the complaint were interposed." *Id.*; *Seligson*, 50 A.D.2d at 209-10 ("[C]onsideration of similarity of transaction and occurrence is relevant only when the defense or counterclaim was barred *at the time of the interposition of the complaint*....") (emphasis added).

Thus, the authorities Counter-Defendants rely upon are inapplicable as they all apply the "close nexus" test where the counterclaim was time-barred at the time of the initial complaint. *Estate of Mantle v. Rothgeb*, 537 F. Supp. 2d 533, 544 (S.D.N.Y. 2008) (a counterclaim that "arose from the same transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, then it is not barred...*notwithstanding that it was barred at the time the claims asserted in the complaint were interposed.*") (internal quotation marks removed, emphasis added); *Cohen Lans LLP v. Naseman*, No. 14CV4045, 2017 WL 477775, at *10 (S.D.N.Y. Feb. 3, 2017) (same); *Corning Inc. v. Freight Revenue Recover of Miami, Inc.*, No. 11-CV-6377, 2012 WL 1805500, at *2 (W.D.N.Y. May 17, 2012) (same); *Distribuidora De Discos Karen C. Por A. v. Universal Music Grp.*, No. 13CV7706, 2017 WL 1019697, at *6 (S.D.N.Y. Mar. 15, 2017) (same); *First Fidelity Bank N.A. New Jersey v. Companhia de Navegacao Maritima Netumar*, 637 F. Supp. 1182, 1184-85 (S.D.N.Y. 1986) (same). Even reliance on *Cohen Lans* for the proposition that Section 203(d) forbids bringing a counterclaim against a non-plaintiff is misplaced, as the court relied upon the close nexus test to first determine that any counterclaims were permissible only as a shield for recoupment purposes and not for affirmative relief. 2017 WL 477775, at *10. But in *Cohen Lans*, there was no recoupment to be had against a party that did not bring a claim. *Id.* Here, however Fenix does

not rely on the close nexus test as its claims were not barred at the time the complaint was filed. Thus, Fenix *may* seek affirmative relief against plaintiffs and other parties or other persons alleged to be liable. *See Seligson*, 50 A.D.2d at 209-10. Fenix is not limited to recoupment relief.

Even if the "close nexus" test applied, it would not bar Fenix's claims because all events occurred around the same time and the claims rely on the same events actions of the parties. *See Distribuidora*, 2017 WL 1019697 at * 6 (indicating the claims were barred for reliance on different facts, time periods, and actions of the parties). Carey's defamation, however, was integral to Fenix's alleged breach of contract. Carey's statements operated as Counter-Defendants' cancellation of the Tour Agreements thereby, as they argue, absolving them of any wrongdoing and entitling them to payment. Thus, adjudicating the merits of the defamation claim requires evaluating the same set of facts to determine whether Fenix breached the Tour Agreements and, whether Counter-Defendants properly terminated them. Thus, there exists a "common thread" connecting the events in the breach of contract and defamation claims. *See Corning Inc.*, 2012 WL 1805500, at *2.

Lastly, where a unity of interest exists between two parties, as Fenix has alleged between Mirage and Carey, New York Law permits a plaintiff to add a defendant to an action have the claim relate back for statute of limitations purposes. *Marvin Neiman, P.C. v. Adar Imp. & Distrib. Co.*, 243 A.D.2d 408, 408-09 (1st Dep't 1997) (permitting a defendant to add a counterclaim defendant and allowing the claim to relate back).

Accordingly, the defamation counterclaims are timely as to both Counter-Defendants.

Accordingly, for the reasons set forth herein, the Motion to Dismiss should be denied.

Dated: June 1, 2018

Respectfully submitted,

/s/ *Robert E. Allen*

**McKool Smith, P.C.**
Robert E. Allen (admitted *pro hac vice*)
rallen@mckoolsmithhennigan.com
Kathryn Lee Boyd (NY Bar No. 2370443)
lboyd@mckoolsmithhennigan.com
M. Storm Byrd (admitted *pro hac vice*)
sbyrd@mckoolsmithhennigan.com
One Bryant Park, 47th Floor
New York, NY
Telephone: (212) 402-9400
Telecopier: (212) 402-9444

***Attorneys for Defendants and Counterclaimants***
**FEG ENTRETENIMIENTOS S.A. and FEG S.A.**